IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CARL M. MURDOCK, JR.,            )
                                 )
        Plaintiff,               )
                                 )
v.                               )        Case No.: 2:16-cv-444-RAH
                                 )                  (WO)
MONTGOMERY COUNTY,               )
ALABAMA, *et al*,                )
                                 )
        Defendants.              )

## MEMORANDUM OPINION and ORDER

## I.     INTRODUCTION

This lawsuit arose following a series of troubling events that resulted in Plaintiff Carl M. Murdock, Jr.'s prolonged detention in the Montgomery County Detention Facility. After his arrest on an outstanding, four-year-old warrant, Murdock was placed into custody and—despite numerous written and verbal complaints to detention facility staff—was denied a court appearance until his 48th day in custody.[1]  When Murdock finally appeared before a Montgomery County circuit court judge, the judge explained that the warrant had been mistakenly issued due to a "clerical error" and ordered Murdock's immediate release. In this 42 U.S.C. § 1983 action, Murdock contends that his 48-day detention violated his civil rights.

---

[1] Rule 4.3(b)(2) of the Alabama Rules of Criminal Procedure requires that a pretrial detainee receive an initial appearance before a judge within 72 hours (3 days) of arrest.

Murdock names as defendants: the City of Montgomery; former Montgomery Police Department (MPD) Chief Kevin Murphy;[2] MPD Officers Jeremy Lewis and Nickie Givan; Montgomery County; former Montgomery County Chief Deputy Sheriff Derrick Cunningham;[3] Montgomery County Detention Facility Director of Detention Colonel Wanda Robinson; and Montgomery County Detention Facility Assistant Director of Detention Major Barbara Palmer. (Doc. 32.)

In his First Amended Complaint, the operative one here, Murdock asserts both federal constitutional and state law claims against the Defendants.  Pursuant to 42 U.S.C. § 1983, he asserts the following constitutional claims:

(1) All Defendants deprived Murdock of his constitutionally protected rights under the Fourth, Fifth, and Fourteenth Amendments, including the right to be free from unreasonable searches and seizures and the right not to be deprived of liberty or property without due process of law.  (Doc. 32 at 10-11 (Count I).)

(2) Montgomery County, Cunningham, Robinson, and Palmer, along with the City of Montgomery and Murphy, acted with deliberate indifference by

---

[2] Murphy was Chief of Police for the City of Montgomery until June 12, 2014. (Doc. 46-7 at 3.)  After that date, John Brown became the Chief of Police.  Murphy was appointed as Deputy Sheriff of the Montgomery County Sheriff's Department in 2015.  However, all claims against Murphy relate to his time at the Montgomery Police Department.

[3] In June of 2014, Cunningham's duties included overseeing the day-to-day operations of the Sheriff's Department, including supervising Robinson in her role as the director of the Montgomery County Detention Facility.  (Doc. 49-7 at 3-4.)

promulgating a custom or policy of inadequate training and supervision, thereby causing Murdock's wrongful arrest and 48-day detention without a court appearance, in violation of the Fourth, Fifth, and Fourteenth Amendments.  (*Id*. at 11-12 (Count II).)

(3) Montgomery County, Cunningham, City of Montgomery, and Murphy failed to implement and/or use appropriate policies, customs, and practices in violation of the Fourth, Fifth, and Fourteenth Amendments.  (*Id*. at 12-13 (Count III).)

(4) Robinson and Palmer failed to implement or use appropriate policies, customs, and practices in violation of the Fourth, Fifth, and Fourteenth Amendments.  (*Id*. at 14 (Count IV).)

(5) Montgomery County acted with deliberate indifference to Murdock's constitutional rights by failing to fund and provide appropriate equipment to ensure proper functioning of the jail, timely release of prisoners, timely criminal procedure, and adequate functioning of the Montgomery County Detention Facility.  (*Id*. at 14-16 (Count V).)

With respect to the § 1983 claims, Murdock seeks injunctive relief against the individual Defendants in their official capacities and monetary relief in their individual capacities.  He also seeks monetary relief against the City of Montgomery and Montgomery County.

In addition to his federal constitutional claims, Murdock advances the following state law claims:

(1) Montgomery County negligently breached its statutory duties by failing to fund adequate equipment for the detention facility and failing to "ensure the circuit court system was adequate and commodious," thereby causing Murdock's wrongful imprisonment and prolonged detention. (*Id*. at 16-17 (Count VI).)

(2) Cunningham, Robinson, Palmer, Murphy, Lewis, and Givan all subjected Murdock to false imprisonment. (Doc. 32 at 17-18 (Count VII).)

(3) Lewis and Givan engaged in an abuse of process. (*Id*. at 18 (Count VIII).)

(4) Lewis and Givan maliciously prosecuted Murdock. (*Id*. at 19 (Count IX).)

(5) Cunningham, Murphy, Lewis, and Givan engaged in a conspiracy to arrest Murdock and deprive him of due process. (*Id*. at 19-20 (Count X).)

(6) The City of Montgomery is responsible for the negligence of its agents, including Cunningham, Robinson, Palmer, Murphy, Lewis, and Givan pursuant to § 11-47-190, Ala. Code 1975. (*Id*. at 20 (Count XI).)

With respect to the state law claims, Murdock seeks injunctive relief against the Defendants in their official capacities, and monetary relief against them in their individual capacities.

4

Pending before the court are two motions for summary judgment. Defendants City of Montgomery, Murphy, Lewis, and Givan (collectively, the City Defendants) filed a motion for summary judgment on June 16, 2017. (Doc. 46.) Defendants Montgomery County, Cunningham, Robinson, and Palmer (collectively, the County Defendants) filed a motion for summary judgment on June 19, 2017. (Doc. 48.) Both motions have been fully briefed by the parties and are ripe for review. (Docs. 47, 50, 53, 54, 55, 57.)

For the reasons that follow, the City Defendants' motion for summary judgment is due to be GRANTED as to the federal claims. The County Defendants' motion for summary judgment is due to be GRANTED in part and DENIED in part.

## II.   JURISDICTION

The court exercises subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. Personal jurisdiction and venue are uncontested.

## III.   STANDARD OF REVIEW

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "[A] court generally must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Fla. Int'l Univ. Bd. Of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016).

However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 981 F.3d 911, 924-25 (11th Cir. 2018).  If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Moreover, the movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id*.  The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that a genuine issue of material fact exists. *Id*. at 1311-12.

A genuine dispute of material fact exists when the plaintiff produces evidence that would allow a reasonable fact-finder to return a verdict in his favor such that summary judgment is not warranted. *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007); *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue

affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).   However, disputes involving material facts are relevant and materiality is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). "[T]here must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Group, Inc.*, 764 F.Supp.2d 1297, 1301 (M.D. Fla. 2011).

"[T]he judge's function [at the summary judgment stage] is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine [dispute] for trial." *Anderson*, 477 U.S. at 249.  In addition, when determining whether summary judgment is appropriate, the law requires a court to accept as true "statements in [the plaintiff's] verified complaint, sworn response to the officers' motion for summary judgment, and sworn affidavit attached to that response." *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019); *see also United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (holding that a plaintiff's purely self-serving and uncorroborated statements "based on personal knowledge or observation" set forth in a verified complaint or affidavit may create an issue of material fact which precludes summary judgment).

"As a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning it relates facts that could not

have possibly been observed or events that are contrary to the laws of nature." *Sears*, 922 F.3d at 1208 (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2019)).

## IV.   BACKGROUND

The facts, taken in the light most favorable to Murdock as the non-movant, are as follows:

**A. Murdock's Arrest**

On May 4, 2006, Murdock pleaded guilty in the Montgomery County Circuit Court to second-degree theft of property and was sentenced to a term of imprisonment, followed by three years of probation. (Doc. 49-5 at 2, 39.)  Upon his release from Kilby Correctional Facility in January 2010, the circuit court placed Murdock on court-supervised probation. (Doc. 46-8 at 2.)

Several months later, for reasons which remain unclear, the circuit court clerk's office issued an arrest warrant based on Murdock's purported "failure to appear" at a probation court appearance.[4] (Doc. 32 at 6; Doc. 46-8 at 2, Doc. 49-5 at 41.)  Shortly thereafter, Murdock's daughter told him that she saw a local television news program that identified Murdock as an individual with an outstanding arrest warrant.  (Doc. 49-1 at 14.) Concerned and confused, Murdock went to the probation

---

[4] Although circuit court Judge Tracy S. McCooey's name is typed at the top of the alias warrant, it was signed by the Clerk of Court, Melissa Rittenour. (Doc. 49-5 at 41.)

office to inquire about the warrant. (*Id*. at 15.)  There, Murdock's probation officer assured Murdock that "everything is squared away, you're free to go."  (*Id*.)

The warrant, however, remained active.  Between 2011 and 2013, various court personnel and Montgomery County Sheriff's Department officials entered notations on a warrant log indicating that the warrant against Murdock was still outstanding.  For example, on April 13, 2011, court personnel noted that the warrant was "still good." (Doc. 46-2 at 2.)  Another official noted on May 23, 2011, that the warrant had been entered into the National Crime Information Center (NCIC) database. (*Id*.)  Other notations reflected the warrant's active status on October 23, 2011, October 23, 2012, and September 20, 2013. (*Id*.)

At some point in May of 2014, four years after the warrant's issuance, Officer Nickie Givan received a list of outstanding warrants from the Montgomery County Sheriff's Department.  Among the warrants included on the list was the warrant for Murdock's arrest. (Doc. 46-1 at 6, 9.)

Prior to serving the arrest warrant, Givan searched for and found Murdock's name and photograph on the "LET" computer system. (*Id*. at 6.)  She then contacted the Sheriff's Department warrant clerk and received confirmation that the warrant remained outstanding. (*Id*. at 6-8.)  Givan also contacted the City dispatcher who confirmed there were no other active warrants in Murdock's name. (Doc. 46-1 at 9.)

On June 19, 2014, Givan began serving the outstanding warrants. Givan, Lewis, and a third officer took separate patrol cars and met at Murdock's residence. There, Lewis and the third officer approached the back door of Murdock's home while Givan knocked on the front door and waited on the porch. (Doc. 46-1 at 8.) When Murdock opened the back door, one of the officers told him there was an outstanding warrant for his arrest. (Doc. 49-1 at 17.) Murdock asked the officer to tell him what the arrest warrant said, but the officer said nothing. (*Id*.) Murdock insisted that he had done nothing wrong and told the officers "[a]ll I do is go to work and come home." (Doc. 49-2 at 29.) The two officers walked with Murdock to the front of the house while Murdock again protested that the warrant must be a mistake. (Doc. 46-1 at 8.)

Murdock was handcuffed and as the officers escorted him to the patrol car, Murdock asked Givan to tell him what the arrest warrant said, but she did not answer. (Doc. 49-1 at 17.) Once inside the patrol car, Lewis showed Murdock his computer screen which displayed the outstanding warrant. (Doc. 49-1 at 17.) Murdock again told Lewis and Givan that the warrant was a mistake. (*Id*.) The officers confirmed once more with the Montgomery County Sheriff's Department that the warrant was active, and then transported Murdock to the Montgomery County Detention Facility for booking. (Doc. 46-1 at 8.)

After turning Murdock over to the facility, Lewis walked across the street to the Montgomery County Circuit Courthouse, obtained the physical warrant and a detention order from the county warrant clerk, and returned the documents to the detention facility. (Doc. 46-1 at 8.)  On its face, the warrant reflected that it was issued by Montgomery County Circuit Court Judge Tracy S. McCooey and was signed by the Clerk of Court, Melissa Rittenour, on May 6, 2010.  The warrant read as follows:

> TO ANY LAW ENFORCEMENT OFFICER:
>
> YOU ARE HEREBY COMMANDED TO ARREST: MURDOCK CARL MURRY AND BRING HIM/HER BEFORE THIS COURT TO ANSWER THE STATE FOR THE CHARGE OF FAILURE TO APPEAR ON THE CHARGE OF:   THEFT OF PROP 2ND – FELONY.

(Doc. 46-6.)  The warrant was signed by Lewis on June 19, 2014, with a check mark acknowledging "defendant arrested by law enforcement, in jail." (*Id*.)

The detention order commanded the jailer to receive "Carl Murry Murdock" into custody without bond. (Doc. 46-6 at 3.)  Left blank was the section of the form that directed when a hearing would be held before a circuit court judge, as was the signature line for a "Circuit Court of Montgomery County" representative. (*Id*.) Instead, handwritten across the top of the form were the words "Judge McCooey," and along the lower half of the form was "D. Givan."  (*Id*.)

11

After handing both the warrant and detention order to a detention facility officer, Lewis and Givan left Murdock at the facility. These two officers had no further dealings with Murdock.

## B. Murdock's Confinement

Upon receiving the arrest warrant and detention order, a booking officer at the Montgomery County Detention Facility took Murdock into custody. Murdock completed various intake forms, was fingerprinted, and received a copy of the facility's Inmate Handbook. (Doc. 49-1 at 27.) This handbook advised detainees and inmates of the procedure for communicating with court personnel and jail administration, such as submitting inmate request forms, grievance forms, and court request forms. (Doc. 50 at 5-6.)

At the time Murdock was taken into custody, detention facility staff and court personnel were to undertake several steps to ensure that Murdock received an initial appearance before a judge within 72 hours of his arrest. (Doc. 49-7 at 5; Doc. 49-8 at 6-8.) These steps were mandated not only by the facility's procedures, but also ensured compliance with the Alabama Rules of Criminal Procedure.

First, all booking paperwork, such as the arrest warrant and detention order, were to be "clocked," i.e., time-stamped, when received by the detention facility clerk. (Doc. 49-8 at 7-9.) The following morning, the detention facility clerk would compile an arrest report listing every detainee, including Murdock, who had been

booked into the facility the previous day. (Doc. 49-7 at 5-6; Doc. 49-8 at 6-7.)  The detention facility clerk was then to walk to the county courthouse with the booking documents and arrest reports and deliver them to the Montgomery County Circuit Clerk's Office. (Doc. 49-7 at 5-6; Doc. 49-8 at 7-8.)

Upon receiving the report and paperwork, the circuit clerk's office was tasked with preparing a "first call list" of pretrial detainees set to appear on the court docket for the day and deliver this list to the detention facility clerk.  (Doc. 49-8 at 7.) Detention facility personnel would then move the court-designated detainees to a holding area where they would be handcuffed and escorted to the Montgomery County Courthouse to await an appearance before a judge. (*Id.*)  Following their appearances, the detainees would be returned to the facility. (*Id.*)

According to the evidentiary record, Murdock's arrest warrant and detention order were received and filed by then-Montgomery County Circuit Clerk Tiffany McCord at 7:00 a.m. on June 20, 2014 (Doc. 49-5 at 41-43).  After this, the process appears to have broken down.  Because Murdock was not scheduled for a court appearance and did not appear before a judge within the requisite 72 hours of his arrest, Murdock presumes that, for some unknown reason, his name never appeared on the first call list. (Doc. 86 at 12.)

During the first few days of his detention, Murdock assumed that he eventually would be scheduled for a court appearance. (Doc. 49-1 at 28.)  But in late

June, having been detained for almost two weeks without a hearing, Murdock became concerned.  He completed an inmate request form and "stated what [his] situation was" and that he "needed to talk to somebody."[5] (Doc. 49-1 at 27–28.)  He addressed the form to Colonel Robinson, the director of the detention facility[6] (Doc. 49-2 at 34) and placed the form into an inmate mailbox designated for receiving inmate requests. (Doc. 49-1 at 27-28.)  Murdock never received a response to this request.[7]  (Doc. 49-1 at 28.)

In early July, after receiving no follow-up or response to his request form, Murdock began asking detention facility staff for other forms. (Doc. 49-1 at 22, 23, 24, 25, 26, 28; Doc. 49-2 at 74.)  He asked various facility officers for grievance forms on up to six occasions and control booth operators on at least three occasions. (Doc. 49-1 at 23.)  Murdock does not remember the names of the officers or control booth operators to whom he spoke.  According to Murdock, multiple employees either ignored his requests or told him that they did not have forms to give him. (Doc. 49-1 at 28.)

_____

[5] When reading the deposition testimony in its full context, it appears that the "situation" Murdock described in the request form was his continued detention without a court appearance, appointment of counsel, or bond hearing.  (*See generally* Doc. 53-4.)

[6] In his deposition, Murdock initially stated that he submitted an inmate request form in June. Later in his deposition, Murdock stated that he submitted a request form to Robinson but was unsure when he submitted it.  When reading the deposition in full, it appears Murdock is referring to the same inmate request form during both discussions.

[7] The County officials maintain they are unaware of any such request submitted by Murdock. (Doc. 49-11 at 7.)  Construing the facts in the light most favorable to Murdock as the non-movant, the court assumes for purposes of summary judgment that Murdock did submit such a form.

Undeterred, Murdock persisted in his efforts.  Every two or three days, Murdock asked the officer performing the head count in his cellblock, "[W]hy am I here? Can you tell me why I'm here? Can you tell me what I'm doing here? Can you tell me why I have no bond?" (Doc. 49-1 at 22.)  Each time, the officer working the shift said he would "get back to [Murdock]," but none of the officers ever followed up as promised.[8] (*Id*.)

Eventually, Murdock encountered a former junior college classmate, Officer Elder. (Doc. 49-2 at 35.) During an initial encounter in June, Elder recognized Murdock and asked why he had been detained. (Doc. 49-1 at 21; Doc. 49-2 at 34-35.)  Murdock responded that he did not know. (Doc. 49-1 at 21.)  Because Elder appeared busy and because Murdock expected he would soon appear in court, Murdock did not initially ask Elder for help. (Doc. 49-2 at 34.)

But during a second encounter in mid-July, Murdock asked Elder to help him find out why he was in jail and asked Elder for a "court notice" form. (Doc. 49-1 at 21; Doc. 49-2 at 35.)  Several days later, Elder returned with the form and told Murdock that "[his] judge was Judge McCooey and she was actually on vacation for the month of July, and so if [he] didn't see her in a couple of days then it would be August before . . . she would be back." (Doc. 49-1 at 21, 24, 26; Doc. 49-2 at 34.)

---

[8] Murdock does not identify by name the officers from whom he requested assistance.

On July 14, 2014, with Officer Elder's assistance, Murdock filled out a motion to the circuit court requesting an attorney, a bond hearing, and a preliminary hearing. (Doc. 49-3 at 7.)  On that same day, another detention facility officer, whose name is unknown, also gave Murdock a grievance form. (Doc. 49-1 at 24.)  Murdock recalled writing "something in [the grievance] about this is Gestapo-tactics to pick me up off the street and hold me," and he placed both the grievance form and the motion into the inmate mailbox. (Doc. 49-1 at 24-25.)  Although facility policy required officers to check the mailbox each weekday (Doc. 49-6 at 51; Doc. 50 at 5), Murdock testified that he observed his grievance form remain in the box for three days before it was picked up by a detention facility officer (Doc. 49-1 at 25).  Once again, Murdock never received a response to the grievance form.[9]

The circuit court, however, did respond to Murdock's motion.  On July 18, 2014—one month after Murdock's arrest—Montgomery County Circuit Court Judge Tracy McCooey entered an order setting a hearing for August 6, 2014. (Doc. 49-1 at 22.)  Upon learning that this hearing had been scheduled, Murdock ceased his efforts to obtain assistance from the detention facility officers. (Doc. 49-1 at 22; Doc. 49-2 at 36.)

---

[9] The County Defendants assert they have no record of a grievance submitted by Murdock. (Doc. 50 at 10.)  However, because the court must construe disputes of fact in favor of the non-movant, the court assumes for purposes of summary judgment that Murdock did submit a grievance form.

## C. The Court Proceeding

On August 6, 2014, Murdock appeared before Judge McCooey.[10]  Puzzled by Murdock's arrest, the court attempted to ascertain what happened.  According to Murdock, he overheard a circuit clerk employee tell Judge McCooey that "she [thought] the warrant was issued in error when [the court] changed from one filing system to another," specifically "a blue file to another file." (Doc. 49-1 at 32.)

During the proceeding, Judge McCooey entered an order for Murdock's immediate release and, concerned that Murdock may have lost his job as a result of his detention, provided him with a letter addressed to his employer, which stated:

> Dear Ms. Marvalene Fletcher,
>
> Carl Murdock was picked up on June 19, 2014 due to a clerical error. A warrant should never have been issued in this case. I am personally writing this letter to make you aware that none of this was his fault. All fines in this case have been set aside and Mr. Murdock is ready to return to his job. If you have any questions, please call my office at (334) 832-1365.
>
> Sincerely,
>
> Honorable Tracy McCooey

(Doc. 49-1 at 32; Doc. 53-6.)

Upon his release, Murdock discovered that numerous personal misfortunes occurred during his 48-day detention.  Because he missed at least three paychecks

---

[10] No transcript was included in the evidentiary materials, and the court is unable to discern whether this proceeding was transcribed.

during his detention, Murdock was unable to make monthly payments on a loan, which forced him to file for Chapter 13 bankruptcy protection. (Doc. 49-2 at 7, 16.) Murdock's car was also repossessed, he lost his apartment, and his roommate sold his personal belongings. (Doc. 49-2 at 14-16.)

## V.   ANALYSIS

### A.  Applicable Constitutional Provision

"The first inquiry in any § 1983 suit" is "to isolate the precise constitutional violation with which [the defendants are] charged." *Baker v. McCollan,* 443 U.S. 137, 140 (1979).  As the Eleventh Circuit has noted, identifying the particular constitutional right alleged to have been violated is "crucial to resolving . . . § 1983 claims" because "different rights prescribe different legal analyses . . . ." *Alcocer v. Mills*, 906 F.3d 944, 947 (11th Cir. 2018).  While Murdock has asserted claims against all Defendants under both the Fourth and Fourteenth Amendments,[11] the County Defendants argue that Murdock's claims are properly analyzed pursuant to the Fourteenth Amendment. (Doc. 50 at 27.)

Deciphering between Fourth and Fourteenth Amendment claims requires careful consideration of the facts. The Fourth Amendment protects the right to be free from unreasonable seizures, *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009), while the Fourteenth Amendment protects, inter alia, the right to be free from

---

[11] As noted, *infra*, Murdock is no longer pursuing his Fifth Amendment claim.

prolonged deprivations of liberty without due process of law, *Baker*, 443 U.S. at 145.

The Supreme Court has held that pretrial detention is a type of seizure to which Fourth Amendment protections attach. *Manuel v. City of Joliet, Ill.,* 137 S. Ct. 911 (2017).  In *Manuel*, a pretrial detainee who was held in custody for 48 days following a probable cause hearing, filed a § 1983 malicious prosecution suit, alleging that his arrest and subsequent detention were based on evidence fabricated by city officers. *Id.*  In its discussion of Manuel's claim, the Supreme Court explained that the Fourth Amendment established the minimum constitutional standards for seizures, "including the detention of suspects pending trial." *Id.* at 917 (quoting *Gerstein v. Pugh,* 420 U.S. 103, 106 (1975)).  The Fourth Amendment, "standing alone, guarantees 'a fair and reliable determination of probable cause as a condition for any significant pretrial restraint.'" *Id.* at 917-18 (quoting *Gerstein*, 420 U.S. at 125).  Accordingly, pretrial detainees who have not been afforded such a finding can "appeal to 'the Fourth Amendment's protection against unfounded invasions of liberty.'" *Id.* at 918 (quoting *Gerstein*, 420 U.S. at 112).

While the Supreme Court did not ultimately reach the full merits of Manuel's case,[12] it did note that Manuel's detention pursuant to a judicial order that lacked any proper basis "violated his Fourth Amendment rights." *Id.*  In doing so, the Court

---

[12] Manuel's case was remanded back to the Seventh Circuit for a determination of when his claim accrued. *Manuel,* 137 S. Ct. at 921-22.

made clear: if a plaintiff's complaint is that his pretrial detention is unsupported by probable cause, then "the right allegedly infringed lies in the Fourth Amendment." *Id.*

In the instant case, although Murdock does challenge the warrant to the extent that he argues the Defendants did not follow the warrant's written mandate, failed to properly investigate the warrant given its age, and should have adopted policies to ensure its recall, he does not allege that the warrant was insufficient to provide probable cause for either his arrest or detention.  Nowhere in Murdock's filings does he mention probable cause.  In fact, he acknowledges that the warrant appeared to be facially valid. (Doc. 54 at 13; Doc. 86 at 8.)  Instead, Murdock's First Amended Complaint, brief in response to summary judgment, and contentions during oral argument focus on his prolonged detention without the process to which he claims he was constitutionally entitled; that is, an initial appearance, appointment of counsel, and a bond determination.

When a pretrial detainee challenges the constitutional sufficiency of the process he received—or failed to receive—while detained, courts within the Eleventh Circuit have joined various other circuit courts in analyzing these claims pursuant to the due process clause of the Fourteenth Amendment. *See West v. Tillman*, 496 F.3d 1321, 1327 (11th Cir. 2007); *Alexander v. City of Muscle Shoals, Ala.*, 766 F. Supp. 2d 1214, 1229 (N.D. Ala. 2011) ("[T]he right to an initial

appearance is secured by the Due Process Clause of the Fourteenth Amendment"); *Jackson v. Hamm,* 78 F. Supp. 2d 1233, 1241 (M.D. Ala. 1999); *Lewis v. City of Birmingham, Ala*., Case No. 2:18-cv-879-GMB, 2020 WL 5057765, at *3 (N.D. Ala. Aug. 27, 2020); *Barnes v. Cullman County District Court*, Case No. 5:16-cv-1691-AKK, 2017 WL 1508239 at *2 (N.D. Ala. 2011); *see also Jauch v. Choctaw Cnty.*, 874 F.3d 425, 427 (5th Cir. 2017) (holding 96-day detention without initial appearance violated procedural due process); *Hayes v. Faulkner Cnty.*, 388 F.3d 669, 673 (8th Cir. 2004) (holding 38-day detention without initial appearance violated substantive due process); *Armstrong v. Squadrito*, 152 F.3d 564, 573 (7th Cir. 1998) (holding 57-day detention without initial appearance violated substantive due process); *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) (holding that 114-day detention without initial appearance violated procedural due process).

This court finds the reasoning within these opinions persuasive. Because Murdock alleges a deprivation of liberty without due process, not a lack of probable cause to support his arrest or detention, his claims sound in the Fourteenth Amendment rather than the Fourth Amendment.

Where a plaintiff alleges that an official's arbitrary or conscience-shocking conduct deprived him of a due process right in the context of his prolonged detention, courts within the Seventh, Eighth, and Eleventh Circuits have treated these

allegations as substantive due process claims.[13] *See Armstrong,* 152 F.3d at 570-73; *Hayes,* 388 F. 3d at 673; *Cannon v. Macon Cnty.*, 1 F.3d 1558 (11th Cir. 1993); *Alexander*, 766 F. Supp. 2d at 1229, 1231-33; *Jackson,* 78 F. Supp. 2d at 1239-41. Because Murdock alleges that City and County officials were deliberately indifferent to his constitutional right to be free from prolonged detention without a court appearance, this court will apply a substantive due process analysis to his claims.

## B. Fifth Amendment Claim

In Count I of the Complaint, Murdock asserts that all of the Defendants violated his Fifth Amendment right to due process.  In his response to the summary judgment motions, Murdock concedes that he is no longer pursuing his Fifth Amendment claim (Doc. 53 at 15; Doc. 54 at 11), therefore summary judgment is due to be GRANTED as to the Fifth Amendment claim in Count I.

## C.  Injunctive Relief

The transfer or release of an inmate renders moot any claims for injunctive or declaratory relief. *See Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *see also Jacoby v. Baldwin Cnty.*, 835 F.3d 1338, 1342 n.1 (11th Cir. 2016) ("since Mr. Jacoby is no longer an inmate at the Baldwin jail, his claims for injunctive relief are

---

[13] Extended detention claims have also been analyzed pursuant to procedural due process, but generally in circumstances where a county's statutory scheme denied a criminal defendant his enumerated constitutional rights, a claim Murdock does not raise in this case. *See Jauch*, 874 F.3d 425; *Oviatt*, 954 F.2d 1470. For a more in-depth discussion of why claims such as Murdock's, where an official's arbitrary or conscience-shocking conduct is at issue, are treated as substantive, rather than procedural, due process claims, see *Armstrong*, 152 F.3d at 570-73, and *Jackson*, 78 F. Supp. 2d at 1239-45.

moot"); *Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (past exposure to even illegal conduct does not in and of itself show a pending case or controversy regarding injunctive relief if unaccompanied by any continuing present injury or real and immediate threat of repeated injury).

The record reveals that Murdock is no longer detained in the Montgomery County Detention Facility.  Therefore, to the extent Murdock seeks injunctive relief with respect to any of his § 1983 claims, Murdock's requests for equitable relief are moot and therefore due to be DISMISSED.

## D. Claims Against the City Defendants

### 1. Officers Lewis and Givan

In Count I, Murdock asserts that Lewis and Givan violated his rights under the Fourth and Fourteenth Amendments, including his right to be free from unreasonable searches and seizures and his right not to be deprived of liberty without due process of law. (Doc. 32 at 10.)  Although it is not clear from the First Amended Complaint, when reading Count I in conjunction with Murdock's other allegations, along with arguments made by Murdock's counsel in response to summary judgment and during oral argument, it appears that Murdock is asserting federal claims of wrongful arrest and false imprisonment against these officers.  (Doc. 32 at 2, 10.) Murdock contends that Lewis and Givan violated his civil rights by arresting him on a warrant they should have suspected was erroneous given its age and by further

failing to follow the specific instructions set forth in the warrant.  He alleges that the officers' conduct ultimately led to his prolonged detention at the hands of the County Defendants, stating that his "wrongful arrest and subsequent false imprisonment could have been prevented if the officers had further investigated after he informed them that the warrant was invalid" and "had the officers followed the instructions on the warrant, the violation could have been minimized or even prevented because [he] could have been released that day had he been before Judge McCooey when arrested." (Doc. 53 at 3.)

Lewis and Givan counter that they are entitled to quasi-judicial immunity, or in the alternative, qualified immunity. (Doc. 47 at 14, 17.)  Although "[o]n its face, § 1983 admits no immunities," the Supreme Court has "consistently recognized that substantive doctrines of privilege and immunity may limit the relief available in § 1983 litigation." *Tower v. Glover,* 467 U.S. 914, 920 (1984).  As a result, both qualified and absolute immunity defenses are available. *Id.*

"Absolute quasi-judicial immunity derives from absolute judicial immunity." *Roland v. Phillips*, 19 F.3d 552, 555 (11th Cir. 1994).  Judges are immune from civil liability under § 1983 for any act performed in their judicial capacity, provided such acts are not done in the "clear absence of all jurisdiction." *Id.* (quoting *Stump v. Sparkman*, 435 U.S. 349, 357 (1978)).  This protection extends to non-judicial officers when they are acting to enforce a judicial order, including effectuating an

arrest warrant. "Nonjudicial officials are encompassed by a judge's absolute immunity when their official duties have an integral relationship with the judicial process" so long as these individuals act within the scope of their authority. *Id*. "[T]he absolute quasi-judicial immunity of a nonjudicial official 'is determined' through a functionary analysis of the action taken by the official in relation to the judicial process." *Id.* (emphasis removed).

"[W]hether there was a facially valid warrant in place determines whether the defendants may be entitled to absolute quasi-judicial immunity or qualified immunity." *Byrd v. Jones*, Case Nos. 7:14-cv-01469-TMP and 7:14-cv-01537-TMP, 2015 WL 2194697 at *8 (N.D. Ala. May 11, 2015) (aff'd *Byrd v. Jones,* 673 F. App'x 968 (11th Cir. 2016)). The Eleventh Circuit has determined that "law enforcement personnel, acting in furtherance of their official duties and relying on a facially valid court order, are entitled to absolute quasi-judicial immunity from suit in a § 1983 action." *Roland*, 19 F.3d at 556. Specifically, when the plaintiff "acknowledges that [an officer] acted pursuant to a warrant, [that officer] has quasi-judicial immunity from suit based on [the plaintiff']s arrest, as [the officer] was acting in furtherance of his official duties and in reliance on a valid judicial order." *Bias v. Crosby*, 346 F. App'x 455, 458 (11th Cir. 2009)

"A warrant does not have to be correct or even lawful, to be facially valid." *Id.* When implementing "a writ which is fair on its face, issued from a court which

had jurisdiction [over] both of the parties and of the subject-matter of the suit . . . which was issued in the regular course of judicial proceeding . . . and which the officer of the court . . . is bound to obey," the executing officer is protected in carrying out the court's mandate. *Matthews v. Densmore*, 109 U.S. 216, 218 (1883).

Further, immunity is not lost even where the charges were ultimately dismissed or where the charges upon which the warrant was issued are found to be erroneous. *Byrd*, 2015 WL 2194697 at *8. Where an arrest warrant is facially valid at the time a plaintiff is arrested, the officer effectuating the arrest is entitled to quasi-judicial immunity.

Here, there is no dispute that Lewis and Givan were executing a facially valid arrest warrant. (Doc. 86 at 8.) Although Murdock argues that the officers should have investigated the warrant further based on its age (*Id.* at 8-9) and Murdock's repeated claims of innocence, their purported failure to do so did not render the warrant invalid on its face. *See Chapman v. City of Atlanta*, 192 F. App'x 922, 924-25 (11th Cir. 2006) (holding "an official executing an arrest warrant is not required by the Constitution to investigate independently every claim of innocence.").

Further, Murdock contends the officers did not follow the directives on the warrant because they delivered him to the detention facility rather than to a judge. (Doc. 53 at 3, 9, 10.) Lewis and Givan respond that the warrant ordered Murdock to be held without bail, which required that they transport him to the detention

facility.  Moreover, the Clerk of the Montgomery County Circuit Court provided the officers a detention order commanding that Murdock be placed into custody.  (Doc. 49-5 at 43.)  Lewis and Givan followed these directives.

Because Lewis and Givan were executing a facially valid warrant at the time they arrested Murdock, the court concludes the officers are entitled to quasi-judicial immunity.[14]  Consequently, the City Defendants' motion for summary judgment is due to be GRANTED with respect to the § 1983 claims against Lewis and Givan.

Because the court has found that Lewis and Givan are entitled to immunity as to the federal claims, the court elects not to exercise pendent jurisdiction as to Murdock's state law claims against these defendants. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").  Accordingly, the state law claims against Lewis and Givan will be DISMISSED without prejudice.

## 2. City of Montgomery and Chief Murphy

Murdock asserts three claims against the City and Murphy.  In Count I, as he did with the officers, Murdock claims both the City and Murphy violated his constitutional rights during his arrest and detention.

---

[14] As the Eleventh Circuit has noted, once the court determines that the defendants are entitled to quasi-judicial immunity, their alternative qualified immunity defense becomes moot. *Roland,* 19 F.3d at 557 n.6 (citing *Valdez,* 878 F.2d at 1288).

In Count II, Murdock asserts that the City, through Murphy, acted with deliberate indifference by promulgating a "custom or policy of inadequate training and supervision" related to the officers' execution of the warrant and by failing to intervene to prevent the violation of Murdock's constitutional rights. (Doc. 32 at 12.)

In Count III, Murdock asserts that the City, through Murphy, "condon[ed] and/or implemented official policy, written or unwritten, which caused the unconstitutional violations of Plaintiff in the manner in which the four (4) year old warrant was executed by Defendants Lewis and Givan." (Doc. 32 at 12-13.)

### a. Chief Murphy – Individual Liability

To the extent Murdock attempts to hold Chief Murphy liable for his arrest and detention based on a supervisory theory, his efforts fail. Supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability. *Cottone v. Jenne*, 326 F.3d 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010). Instead, to hold a supervisor liable, a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation. *Id.*

Although the First Amended Complaint names Murphy as a defendant on the basis that "at all time material to this complaint" he "was the commanding officer of

Defendants Lewis and Givan and was responsible for their training, supervision, and conduct" (Doc. 32 at 5), there is no dispute that Murphy left the Montgomery Police Department on June 12, 2014. (Doc. 46-7 at 3.)  Murdock was arrested on June 19, 2014, one week after Murphy's departure.

Murphy was neither employed by the City of Montgomery on the day the warrant was executed nor was he personally involved in effectuating the arrest.  He could not have directly participated in the conduct alleged in the First Amended Complaint because he was not employed with the City at the time of the arrest, and Murdock has not otherwise shown a causal connection between Murphy's own actions and the alleged constitutional violations.  Therefore, the City Defendants' motion for summary judgment is due to be GRANTED as to the federal claims against Murphy related to his individual liability for the execution of the arrest warrant on June 19, 2014.

### b.  City of Montgomery – Municipal Liability

The court now turns to Murdock's claims of municipal liability under § 1983. In *Monell v. New York City Department of Social Services,* the United States Supreme Court held that a municipality can be liable for deprivations of constitutional rights under § 1983. 486 U.S. 658 (1978).  However, the Court placed limitations on the circumstances in which liability may be imposed.

Under § 1983, there can be no *respondeat superior* liability because a

municipality cannot be sued for the acts of others, including employees of the municipality. *See Monell,* 436 U.S. at 691-94; *see also Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir. 1998), *cert. denied,* 525 U.S. 870 (1998).  Instead, "municipal liability is limited to action for which the municipality is actually responsible." *Doe v. Sch. Bd. of Broward Cnty., Fla.,* 604 F.3d 1248, 1263 (11th Cir. 2010) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479–80 (1986)).

Thus, to prevail on a § 1983 claim against a municipality, a plaintiff is required to satisfy a two-prong test for municipal liability.  A plaintiff must (1) "identify conduct attributable to the municipality," and (2) "show that it 'was taken with the requisite degree of culpability, *i.e.,* that the municipal action was taken with deliberate indifference to its known or obvious consequences.'" *Doe v. City of Demopolis,* 799 F. Supp. 2d 1300, 1313 (S.D. Ala. 2011) (quoting *Sch. Bd. of Broward Cnty., Fla.,* 604 F.3d at 1263).

Regarding the test's first prong, conduct is attributable to a municipality only if it "result[s] from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." *Sch. Bd. of Broward Cnty., Fla.,* 604 F.3d at 1263 (quoting *Denno v. School Bd. of Volusia Cnty., Fla.,* 218 F.3d 1267, 1276 (11th Cir. 2000)).  As to the second prong, the Supreme Court has held that deliberate indifference "is a stringent standard of fault, requiring proof that a

municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 410 (1997).

> Under either avenue, a plaintiff (1) must show that the local governmental entity . . . has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue.

*Grech v. Clayton Cnty., Ga*., 335 F.3d 1326, 1329 (11th Cir. 2003).

### i.    Count I

In Count I of the First Amended Complaint, Murdock alleges that the City and Murphy's "actions and inactions" deprived him of his constitutional right to be free from unreasonable searches and seizures and deprived him of liberty without due process. (Doc. 32 at 10-11.)  The allegations in Count I are rather broad, alleging general constitutional violations on the part of all Defendants.  But in his brief in response to the City Defendant's summary judgment motion, and during oral argument, Murdock refines his argument, taking issue with the City's policies and procedures for verifying warrants and effectuating arrests based on those warrants. (*See* Doc. 53 at 12-14.)  Murdock contends that his 48-day detention would have never occurred but for the actions of the City officers (Doc. 86 at 10, 18) and argues that the policies Lewis and Givan followed when executing the arrest warrant were ineffective to prevent a violation of Murdock's constitutional rights.

Specifically, Murdock points to deposition testimony from the officers regarding the policies followed during his arrest. Givan testified that she received the warrant list with Murdock's name "a month or so" before arresting him (Doc. 53-2 at 43) and failed to obtain an updated list before serving the warrant. She also testified that City officers sometimes "make contact" with an individual who has an outstanding warrant, then "call and verify" the warrant later. (Doc. 53-2 at 50.) For his part, Lewis testified that the actions taken at the time Murdock was arrested were in compliance with the "policies and training and procedures" required of all City officers (Doc. 53-3 at 29) and that he was unaware of anything further the officers could have done to investigate the warrant (Doc. 53-3 at 33).

It is well-established that a city or its officials "may only be liable under § 1983 "if an action pursuant to official policy of some nature caused a constitutional tort." *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994). There is no dispute that the procedures followed by Lewis and Givan are official city policies and practices. (Doc. 47 at 7; Doc. 55 at 3.) But "to show an unconstitutional policy or custom, Plaintiff must identify the policy or custom, connect the policy or custom with the government entity itself, and show that the particular injury was incurred because of the execution of that policy." *Bennett v. City of Slidell*, 782 F.2d 762, 767 (5th Cir. 1984).

The "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  Here, the evidence does not demonstrate the causation necessary for Murdock to succeed on his claim.  The unfortunate events at issue here were triggered by the warrant's erroneous issuance, not the policies followed during its execution.  And Murdock's prolonged detention was at the hands of County employees—not City officials.  Murdock has not shown that the City's policies caused the warrant to be issued in error.  The fault for that mistake arguably lies with the Montgomery County Circuit Court or the court clerk's office, entities not named as defendants in this lawsuit.  Likewise, there is no causal link between the City's policies for effectuating arrest warrants and Murdock's subsequent 48-day detention in the Montgomery County Detention Facility.

Although Murdock contends the City officers should have done more to investigate the warrant given its age and Murdock's protestations, it is uncertain that any further investigation would have revealed the warrant's erroneous origin. Before taking Murdock to the detention facility, Lewis and Givan, following City policy, received *numerous* confirmations that the warrant was valid and active. (Doc. 46-1 at 8; Doc. 49-1 at 17.)  While the City's policies did not uncover the erroneous nature of the warrant, those policies are not the cause of any constitutional violation

suffered by Murdock.  Accordingly, as to Count I, summary judgment is due to be GRANTED in favor of the City.

### ii.    Count II

In Count II, Murdock asserts that the City, through Murphy, failed to adequately train the City's officers. (Doc. 32 at 11-12.) The City is entitled to summary judgment as to this claim.

A plaintiff must show that the "failure to train reflects a 'deliberate' or 'conscious' choice by a municipality." *City of Canton*, 489 U.S. at 390.  Without notice of a need to train or supervise in a particular area, a municipality is not liable for any failure to train and supervise. *Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998).  To determine whether a failure to train amounts to a deliberate or conscious choice by a municipality, courts are instructed to look at the "degree of fault" of a municipality's failure to train and determine whether it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388.  With respect to police officer training, the deliberate indifference standard is a high threshold. *Id.* at 391; *see also Connick v. Thompson*, 563 U.S. 51, 70 (2011).

Ordinarily, to meet this high standard, a plaintiff must allege a pattern of widespread constitutional violations that would put the municipality on notice of its inadequate training. *See Connick*, 563 U.S. at 62. To establish lack of adequate

training based on an isolated incident, rather than a widespread pattern, "the likelihood for [a] constitutional violation [must be] so high that the need for training would be obvious." *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009).

The court cannot conclude that the facts of this case, as they apply to the City, fit the "obvious" standard. The evidence demonstrates that Lewis and Givan exercised diligence and followed their training on City policies when executing the warrant. On the day of Murdock's arrest, the officers confirmed with a dispatcher, the sheriff's department warrant clerk, and their police vehicle's dashboard computer that the warrant was active. (Doc. 46-1 at 8.) And after arresting Murdock, Lewis obtained both the written warrant and a detention order from the circuit court. (Doc. 49-1 at 17.) Each of these actions confirmed the warrant was valid and active.

Further, the parties agree that they are not aware of any other instances where a warrant was issued because of a clerical error, much less an instance where an erroneous warrant resulted in the arrest of a person who was then detained for weeks without an appearance before a judge. (Doc. 86 at 33, 47.) Murdock acknowledges that, from all the information available at the time, the officers had no reason to know the warrant was not valid other than the fact that the underlying charge was four years old. (Doc. 86 at 8.) But a warrant's age alone does not render it invalid,

expired, or ineffectual on its face. *See Pickens v. Hollowell*, 59 F.3d 1203, 1207-08 (11th Cir. 1995).

Nor did the fact that the warrant had been outstanding for some time put the City on notice of an "obvious" need to require its officers to continue investigating a warrant after receiving multiple confirmations of its validity.  This court cannot say that a City official who implements policies to verify and execute arrest warrants should have foreseen a series of events such as those present here.

What happened to Murdock is extremely troubling. His allegations regarding the failure to train City officers, though, are not the sort which "rise to the level of obviousness reserved for 'a narrow range of circumstances [where] a violation of federal rights may be a highly predictable consequence' of a failure to provide adequate training." *Lewis,* 561 F.3d at 1293.  As a result, the court will GRANT summary judgment on Count II in favor of the City.

### iii.    Count III

In Count III, Murdock asserts that the City, through Chief Murphy, failed to implement policies between 2010 and 2014 to ensure the recall of the unexecuted warrant issued by the circuit court. (Doc. 32 at 12-13.)  This claim fails factually and as a matter of law.

Applying the test for municipal liability, the failure to recall the warrant is not conduct attributable to the City of Montgomery. Neither the City nor its officials had

the legal authority to direct the circuit court to recall Murdock's warrant.  Only circuit court Judge Tracey McCooey had this authority. *See Ex parte Greensboro*, 948 So. 2d 540 (Ala. 2006) (acts performed by municipal court clerk/magistrate to ensure that arrest warrants are recalled is a judicial function); *see also* State of Alabama Unified Judicial System Form CR-59.[15]

On this issue, the evidence does not demonstrate that the City's policies or Murphy's actions were legally insufficient or improper. City officials did not have "authority and responsibility over the government function in issue" here nor "final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue." *Grech*, 335 F.3d at 1329.  Consequently, summary judgment is due to be GRANTED in favor of the City as to Count III of the First Amended Complaint.

Because the court has granted summary judgment in favor of the City of Montgomery as to all federal claims, the court declines to exercise pendent jurisdiction as to Murdock's state law claims against the City and Murphy. *See Gibbs,* 383 U.S. at 726.  Accordingly, these claims will be DISMISSED without prejudice.

---

[15] Warrant recall order available at: https://eforms.alacourt.gov/criminal-forms/.

### E. Section 1983 Claims against the County Defendants

#### 1. Montgomery County

During oral argument on the motions for summary judgment, Murdock's counsel conceded that all the claims against Montgomery County are due to be dismissed. (Doc. 86 at 3-4.)  Based on this assertion, the § 1983 claims against the County in Counts I, II, III, and V, and the state law claim asserted in Count VI, are due to be DISMISSED with prejudice.

#### 2. Individual County Defendants

In Count I of his First Amended Complaint, Murdock alleges a general claim that all Defendants, including Cunningham, Robinson, and Palmer, violated his constitutional rights, and in Counts II, III, and IV, Murdock alleges the County Defendants failed to train detention facility officers, failed to implement appropriate policies, and adopted and implemented unconstitutional policies, customs, and practices. (Doc. 32 at 11-14.)  The crux of these claims is Murdock's contention that the individual County Defendants were deliberately indifferent to his right to be free from prolonged detention. (Doc. 54 at 14-15.)  Murdock argues that his 48-day detention could have been prevented had detention facility staff acknowledged his repeated requests for a hearing.

### a. *Chief Deputy Sheriff Cunningham*

### i.    **Count I**

In Count I, Murdock lists Cunningham among the defendants he claims violated his constitutional rights, but the First Amended Complaint does not specify which of Cunningham's actions deprived Murdock of any particular right. (*See* Doc. 32 at 10.)   In his brief in response to summary judgment, Murdock groups Cunningham with defendants Robinson and Palmer, arguing that Cunningham's failure to follow the warrant's directive to immediately bring Murdock before the circuit court violated Murdock's Fourth and Fourteenth Amendment rights. (Doc. 54 at 12-14.)  Murdock does not, however, allege any facts or present any evidence of Cunningham's personal involvement in Murdock's detention.[16]

Section 1983 does not generally recognize *respondeat superior* liability. *Braddy v. Florida Dept. of Labor & Employment Sec*., 133 F.3d 797, 802 (11th Cir. 1998).  Instead, supervisory defendants are liable only if they personally participated in the allegedly unconstitutional conduct or if there is "a causal connection between

---

[16] Murdock does contend that Alabama law imposes a personal duty on Cunningham related to the detention of probation violators, and that this duty was breached when Cunningham detained Murdock on a probation violation in excess of 20 days. (Doc. 54 at 16-17.)  Section 15-22-54(c) of the Code of Alabama provides that "no probationer shall be held in jail awaiting [a] violation hearing for longer than 20 business days, unless new criminal charges are pending.  If the hearing is not held within the specified time, the sheriff shall release the probation violator unless there are other pending criminal charges." Ala. Code § 15-22-54(c).  What Murdock alleges here is a violation of state law.  A state law violation alone cannot support a claim of liability under § 1983; instead, there must be some federal statutory or constitutional component to the claim. *See Maine v. Thiboutot*, 448 U.S. 1, 4 (1980).  What's more, this statute applies to sheriffs.  Cunningham was a chief deputy sheriff, not sheriff, at the time of the events alleged in the First Amended Complaint.  The sheriff is not named as a defendant in this lawsuit.

[their] actions . . . and the alleged constitutional deprivation." *Cottone,* 326 F.3d at 1360.  At the time of Murdock's detention, Cunningham was chief deputy sheriff of Montgomery County, later becoming sheriff. (Doc. 49-7 at 9; Doc. 86 at 25.)  Unlike Defendants Robinson and Palmer, as discussed *infra*, Murdock does not allege that Cunningham was ever present at the detention facility during Murdock's detention or that Cunningham was ever on notice that Murdock had been detained for weeks without an appearance before a judge.  Cunningham testified during his deposition that he does not recall meeting Murdock and was not aware of Murdock's detention in the facility until the present lawsuit was filed. (Doc. 49-7 at 6, 7, 11.)  Under these circumstances, Cunningham did not possess the level of personal knowledge typically required to hold an official liable in his individual capacity. Absent Cunningham's personal involvement or a causal connection between his actions and the alleged constitutional violations, summary judgment is due to be GRANTED in Cunningham's favor as to Count I.

### ii.    Count II

As to Count II, Murdock alleges that Cunningham breached a duty to adequately train and supervise detention facility employees and breached a duty to intervene when an individual's constitutional rights are being violated. (Doc. 32 at 12.)  In order to survive the County Defendants' motion for summary judgment as to Count II, Murdock must present sufficient evidence of either a "custom or policy

[that] result[s] in deliberate indifference to constitutional rights," facts that support an "inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," or "a history of widespread abuse [that] put[ ] the responsible supervisor on notice of the need to correct the alleged deprivation, and he fail[ed] to do so." *Cottone*, 326 F.3d at 1360. "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted).

Here, although Cunningham acknowledged that facility director Robinson reported to him, there are no other allegations or evidence that Cunningham had any involvement in training or directing staff at the detention facility to support an inference that he "directed . . . subordinates to act unlawfully" or knew they would do so and failed to stop them. *Id.* When questioned during his deposition about the specifics of detention facility policies, procedures, and training, Cunningham repeatedly deferred to Robinson for answers to those questions. (Doc. 49-7 at 7, 8, 9, 10, 11.)

Nonetheless, Murdock contends that Cunningham "promulgated a custom or policy of inadequate training and supervision that demonstrated deliberate indifference . . . ." (Doc. 32 at 11.) But as previously noted, the parties agree that

they are unaware of any other instances of detainees at the detention facility being held for weeks without a court hearing.  "Evidence that the Jail staff occasionally erred and failed to fulfill their duties as instructed is insufficient to satisfy the high standard for supervisory liability." *West*, 496 F.3d 1331.  Absent a showing of a history of widespread abuse that would have put Cunningham on notice of the obvious need for further training, summary judgment is due to be GRANTED in favor of Cunningham as to Count II.

### iii.   Count III

With regard to Murdock's claim in Count III that Cunningham adopted policies that failed to recall a four-year-old warrant (Doc. 32 at 13), as the court has already discussed in its analysis of this claim against the City Defendants, only Circuit Judge Tracey McCooey had the authority to recall a warrant issued by her office. *See Ex parte Greensboro*, 948 So. 2d at 543 (recalling warrants is a judicial function).   Cunningham did not have "authority and responsibility over the government function in issue" in Count III nor did he have "final policymaking authority . . . concerning the act alleged to have caused the particular constitutional violation in issue." *Grech*, 335 F.3d at 1329.  Summary judgment is due to be GRANTED in favor of Cunningham on Count III.

Having granted summary judgment in favor of Cunningham on all federal claims, the court elects not to exercise pendent jurisdiction as to Murdock's state law

claims against Cunningham. *See Gibbs,* 383 U.S. at 726.  Accordingly, those claims will be DISMISSED without prejudice.

### b.  Colonel Robinson and Major Palmer

#### i.   Count I

As he did with all other defendants, Murdock names Robinson and Palmer in Count I of the First Amended Complaint.  Therein, Murdock claims that Robinson and Palmer's actions and inactions resulted in his prolonged detention in the Montgomery County Detention Facility without due process,[17] namely an initial appearance or appointment of counsel. (Doc. 32 at 7-8 .)

Unlike a hearing to determine probable cause, the Alabama Rules of Criminal Procedure mandate an initial appearance before a neutral magistrate whether an arrest is made with or without a warrant. *See* Ala. R. Crim. P. 4.3.  Importantly, "[t]he information imparted to a detainee at [an initial] appearance serves to enforce or give meaning to important individual rights," including notice to the accused of the charges against him, the constitutional right to counsel, and the privilege against self-incrimination. *Alexander,* 766 F. Supp. 2d at 1231-32.  Consequently, "an extensive detention without a first appearance substantially impinges upon and threatens" those constitutional rights. *Id.* at 1232.

---

[17] In Count I, Murdock asserts that his 48-day detention violated both his Fourth and Fourteenth Amendment rights. But as the court has already determined, Murdock's claims are properly analyzed under the Fourteenth Amendment.

### A. Liability under § 1983

There is no dispute among the parties that Murdock was detained for 48 days without any hearing whatsoever.  However, Robinson and Palmer's failure to meet the 72-hour deadline required by Rule 4.3(b) of the Alabama Rules of Criminal Procedure does not, without more, infringe upon Murdock's constitutional rights. *Barnes,* 2017 WL 1508239 at *2.  Instead, to have a valid constitutional claim, Murdock must present facts demonstrating Robinson and Palmer's deliberate indifference to his Fourteenth Amendment rights.  "Conduct by a government actor . . . will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience-shocking in a constitutional sense." *Davis v. Carter*, 555 F.3d 979, 982 (11th Cir. 2009).

"[L]iability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *County of Sacramento*, 523 U.S. at 853.

### B. Qualified Immunity

Robinson and Palmer raise the defense of qualified immunity.  (Doc. 50 at 29.)  Qualified immunity protects government officials from suit unless they violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A defendant

"asserting that he is entitled to the protection of qualified immunity must initially establish that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Once the defendant has made this showing, the burden shifts to the plaintiff" to show that qualified immunity is not appropriate. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007) (internal citations omitted).

To determine whether allegedly wrongful actions are in an individual's "discretionary authority," courts assess whether the acts in question "are of a type that fell within the employee's job responsibilities.  The inquiry is two-fold: courts ask whether the government employee was (1) performing a legitimate job-related function; that is, pursuing a job-related goal, and (2) performing this function through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

In applying each prong of this test, the court should "look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Id.* at 1266.   Allegedly unlawful intent is irrelevant. *Plotkin v. United States*, 465 F. App'x 828, 831–32 (11th Cir. 2012) ("In determining whether a defendant performed a discretionary function, our inquiry is not whether the act complained of

45

was done for an improper purpose . . . .").  Instead "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Mikko v. City of Atlanta, Ga.*, 857 F.3d 1136, 1144 (11th Cir. 2017) (internal quotation marks and citations omitted).

Once a defendant has proven that she was acting within her discretionary authority, the burden shifts to the plaintiff, who must make two showings.  The plaintiff must "establish that the defendant violated a constitutional right" and that the right violated was "clearly established" by law.[18]  *Griffin Indus., Inc.*, 496 F.3d at 1199 (internal citations omitted).  In considering whether a right is "clearly established," relevant law "consists of holdings of the Supreme Court, the Eleventh Circuit, or the highest court of the relevant state." *Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019).  Guided by this analysis, the court now considers Robinson and Palmer's claims of qualified immunity.

### 1. Discretionary Authority

Arguing that Robinson and Palmer ignored the warrant's command that Murdock be brought before the circuit court, Murdock submits that these defendants were not acting within their discretionary authority.  The inquiry here, however, is

---

[18] Courts may consider these prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

not whether Robinson and Palmer had the discretionary authority to detain Murdock without an immediate court appearance, but rather, whether holding and releasing detainees is reasonably related to the duties of a detention facility director.  "Holding and releasing prisoners is within the scope of the discretionary authority of jail administrators and jailers." *Williams v. Williams*, Case No. 1:10-cv-34-WHA-SRW, 2010 WL 779290, at * 3 (M.D. Ala. May 21, 2010).

The court concludes that during Murdock's detention, Robinson and Palmer were acting within their discretionary authority as facility directors. This shifts the burden to Murdock to demonstrate that qualified immunity is not appropriate. To do so, Murdock must show that Robinson and Palmer violated a constitutional right and that the right was clearly established at the time of the alleged violation.  *Youmans*, 626 F.3d at 562.

## 2.  Constitutional Violation

To establish a Fourteenth Amendment substantive due process violation, Murdock must show that Robinson and Palmer acted with deliberate indifference to his constitutional rights. *Cannon v. Macon County,* 1 F.3d 1558, 1563 (11th Cir. 1993).  Human error does not equal deliberate indifference.  Instead, Murdock must demonstrate that Robinson and Palmer had "(1) subjective knowledge of a risk of serious harm; [and] (2) disregard[ed] . . . that risk; (3) by conduct that is more than

mere negligence." *Cagle v. Sutherland,* 334 F.3d 980, 987 (11th Cir. 2003) (internal quotation marks and citation omitted) (alteration in original).

At this point in the court's analysis, a particular dispute of fact between the parties becomes material. Murdock maintains that during his 48-day detention, he submitted both an inmate request form addressed to Colonel Robinson and a grievance form[19] notifying detention facility staff of his prolonged detention without a court appearance, yet he never received a response to either form. (Doc. 49-1 at 27-28; Doc. 49-2 at 34.)

Robinson and Palmer claim that they have no record that Murdock submitted any forms during his detention.[20] In fact, despite working inside the Montgomery County Detention Facility and being charged with the custody and care of all inmates and detainees therein, despite walking through the facility at least three times each week to speak with inmates (Doc. 49-8 at 14; Doc. 49-9 at 4), and despite Murdock's

---

[19] While Murdock has not provided evidence, other than his own testimony, to prove he submitted these two forms or to prove the substance of his complaints, based on his testimony, he would be unable to do so. Robinson testified that when a detainee submits a grievance, a copy is made and kept within the detention facility's files. (Doc. 49-8 at 16.) Although facility policy requires the grievance clerk to send a written receipt to the detainee indicating the date and time the clerk received the complaint (Doc. 49-6 at 51), a copy of the form is not required to be returned to the detainee. Murdock testified during his deposition that he submitted two complaint forms, neither of which received a confirmation or response, written or otherwise. He also filed an affidavit confirming this averment. (Doc. 53-1 at 2.) Murdock's testimony and affidavit are sufficient to create a genuine issue of material fact as to whether he submitted either form. *See Stein*, 881 F.3d at 857 (holding that a plaintiff's purely self-serving and uncorroborated statements "based on personal knowledge or observation" set forth in a verified complaint or affidavit may create an issue of material fact which precludes summary judgment).

[20] In their summary judgment reply brief, Robinson and Palmer accept as true Murdock's claim that his written requests were ignored but say they have produced "unrefuted evidence" that they had no subjective knowledge of a substantial risk of harm to Murdock. (Doc. 57 at 13.) The "evidence," however, is actually just attorney argument set forth in their own summary judgment brief. (Doc. 50 at 34-35.)

presence in the facility for *48 days*, these defendants insist "they did not know Murdock; they did not know he was incarcerated in the facility; they never had any communications with him; and that they were never made aware of his requests for a court hearing." (Doc. 50 at 31.)

Notwithstanding these averments, at the summary judgment stage, this court must construe this dispute of fact in favor of Murdock as the non-movant. The "facts" at the summary judgment stage are not necessarily what a jury at trial would, or will, determine to be the facts. *See Perez v. Suszczynski*, 809 F.3d 1213, 1217 (11th Cir. 2016). Instead, the facts at this procedural stage are what a reasonable jury *could* find from the evidence viewed in the light most favorable to the party opposing summary judgment. *Scott v. United States*, 825 F.3d 1275, 1278 (11th Cir. 2016); *Swint v. City of Wadley, Ala.*, 51 F.3d 988, 992 (11th Cir. 1995) (emphasis added). These fact-defining rules are especially important here because whether a jury credits Murdock's account of the facts could be outcome-determinative in this case.

Counsel for Robinson and Palmer acknowledged at oral argument that any form submitted by a detainee stating he had not received a hearing within 72 hours of his arrest "would have gone to the attention of the director or at least the assistant director" of the facility. (Doc. 86 at 36.) Counsel's acknowledgment is confirmed by Montgomery County Detention Facility Policy No. E-401 which provides that

"an emergency grievance[21] . . . should be forwarded . . . immediately to an official at a level capable of immediately correcting the situation" and that "[e]mergency grievances should receive an expedited response at every level." (Doc. 49-6 at 55.)

In addition, Robinson stated during her deposition testimony that one of her duties as director of the detention facility is to "deal with grievances," either by responding to written forms or "walk[ing] the jail [and] talk[ing] to the inmates." (Doc. 49-8 at 14.) As assistant director of the facility, Palmer, too, was responsible for handling grievances and "walk[ing] the floor at least three times a week" to address inmate issues. (Doc. 49-9 at 4.) Robinson further testified that if a detainee submitted a form complaining that he had not received a court appearance, "that's just a matter of simply picking up the phone and calling over to the clerk's office." (*Id*.)

A reasonable jury could credit Murdock's testimony that on two separate occasions he followed detention facility procedure to submit complaint forms to facility staff, including an inmate request form addressed directly to Robinson.[22] If

---

[21] The detention facility's Policy and Procedure Directive identifies an emergency grievance as one which presents a "substantial risk of serious harm or another factor requiring expedited consideration." (Doc. 49-6 at 55.)

[22] A jury could instead find Robinson and Palmer's account of the facts more credible. There is testimonial evidence in the record to support both accounts. Either way, weighing evidence and determining the credibility of the parties is not the court's role at this procedural stage. *Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016) (Issues of material fact are properly resolved "only by a finder of fact because [the issues] may reasonably be resolved in favor of either party."). Instead, "[w]hen considering a motion for summary judgment, including one asserting qualified immunity, 'courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party and when conflicts arise between the facts evidenced by the parties, [the court must] credit the nonmoving party's version.'" *Feliciano*, 707 F.3d at 1252 (quoting *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006)).

Murdock's forms indicated that he had not yet received a court appearance, those forms would have gone to the attention of either Robinson as the facility director or to Palmer as the assistant director, putting these defendants on notice that Murdock had been detained for weeks without a hearing.[23]

A jury could then reasonably find that the directors' knowledge of Murdock's detention without a court appearance, combined with their failure to make a simple phone call on his behalf, was more than mere negligence. Instead, a reasonable jury could find that these defendants knew their inaction could lead to Murdock's continued detention without due process and yet they disregarded any such risk. If a jury finds Murdock's contentions credible, it could reasonably find that Robinson and Palmer's conscious disregard of an ongoing, weeks-long constitutional violation demonstrates deliberate indifference at a level that shocks the conscience.

The court acknowledges that the deliberate indifference standard is "a difficult burden for a plaintiff to meet." *Popham v. City of Talladega*, 908 F.2d 1561, 1563 (11th Cir. 1990). Nonetheless, Murdock has presented facts sufficient for a reasonable fact-finder to determine that he has overcome this burden. *See Armstrong*, 152 F.3d at 580 (holding plaintiff's continued protests regarding his detention without a court appearance provided an inference that detention officers knew of a serious risk and their failure to pass on those complaints to their

---

[23] The County defendants do not assert the affirmative defense of failure to exhaust in this case. (Doc. 86 at 46.)

supervisors evinced serious possibility of deliberate indifference, precluding summary judgment); *see also Hayes*, 388 F.3d at 674-75 (holding jail administrator was not entitled to qualified immunity where administrator consciously disregarded detainee's grievance regarding his failure to receive a first appearance required by state law.  Because a jury could so reasonably find, summary judgment cannot be granted on the theory that there is no Fourteenth Amendment violation here.

The first prong of qualified immunity having been satisfied, the court now turns to the issue of whether Murdock's constitutional right to be free from prolonged detention without due process was clearly established.

### 3.  Clearly Established

Robinson and Palmer are entitled to qualified immunity unless their disregard of Murdock's complaints were not only violative of Murdock's constitutional rights, as a jury could reasonably find, but also that those rights were clearly established by law. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability.").

The customary way of demonstrating that a plaintiff's constitutional rights were clearly established is by identifying a case, in existence at the time of the purported violation, in which the Supreme Court or the Eleventh Circuit found a violation based on materially similar facts. *Priester v. City of Riviera Beach*, 208

F.3d 919, 926 (11th Cir. 2000) ("[U]nless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity.").  A materially similar decision in a pre-existing case would "make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Id.*  A close factual fit between the pre-existing case and the case at issue is typically essential because general propositions from prior decisions will not do. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

That said, given the discrete factual circumstances that exist within each case, a pre-existing decision with material similarity is not always necessary to clearly establish the applicable law. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Cannon*, 1 F.3d at 1564-65 (holding pretrial detainee had a clearly established right to be free from false imprisonment without due process even where no prior precedent had held that the jail official's specific conduct gave rise to §1983 liability); *Cantu v. City of Dothan, Ala.*, 974 F.3d 1217, 1232-35 (11th Cir. 2020) (holding police officer was not entitled to qualified immunity where her use of force was so excessive that a reasonable officer should have known it was unconstitutional).

As the Supreme Court recognized in its *Hope* decision, requiring plaintiffs to find a "materially similar" pre-existing case places a "rigid gloss on the qualified immunity standard" that is inconsistent with the Court's earlier precedent. *Id.* at 739. The "obvious clarity exception," as it is called, means that "officials can still be on

notice that their conduct violates established law . . . even in novel factual circumstances." *Hope*, 536 U.S. at 741. The inquiry remains the same: at the time she engaged in the conduct giving rise to the claim, did the defendant have fair warning that her conduct was unconstitutional? *See id.*

District courts in Alabama have found that prolonged detentions without an initial appearance can violate a detainee's substantive due process rights under the Fourteenth Amendment. *Alexander*, 766 F. Supp. 2d at 1229; *Barnes,* 2017 WL 1508239 at *2; *Jackson v. Hamm*, 78 F. Supp. 2d 1233, 1241 (M.D. Ala. 1999). While neither the Supreme Court nor the Eleventh Circuit has specifically decided whether the failure to provide a timely court appearance to a pretrial detainee is a violation of a clearly established constitutional right, these courts have considered whether *continued* or *prolonged* detentions of pretrial detainees are constitutional.

In *Gerstein v. Pugh,* 420 U.S. 103 (1975), the case establishing the Fourth Amendment right to a prompt judicial determination of probable cause following a warrantless arrest, the Supreme Court recognized that "[t]he consequences of prolonged detention may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships." *Id.* at 114. While this language in *Gerstein* helps to establish the depth of constitutional concern for prolonged detention, the decision admittedly applies only to arrests without a warrant.

54

Four years later, in *Baker v. McCollan*, 443 U.S. 137 (1979), the Court held that the plaintiff, who was arrested and detained for three days despite his protests of mistaken identity, failed to demonstrate a constitutional violation because his relatively short detention pursuant to a valid warrant did not amount to a deprivation of liberty without due process.  The Court went on, though, to note that after the lapse of a certain amount of time, continued detention in the face of repeated protests will deprive the accused of liberty without due process. The Court acknowledged:

> Obviously, one in [a pretrial detainee's] position could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment . . . . We may even assume, *arguendo*, that depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of "liberty . . . without due process of law."

*Baker*, 443 U.S. at 144-45.

Courts in other Circuits have relied on the pronouncements in *Baker* to hold that prolonged detentions without an initial appearance violate due process rights afforded by the Fourteenth Amendment. *See Jauch*, 874 F.3d at 427 (holding 96-day detention without initial appearance violated procedural due process); *Hayes*, 388 F.3d at 673 (holding 38-day detention without initial appearance violated substantive due process); *Armstrong*, 152 F.3d at 573 (holding 57-day detention without initial

appearance violated substantive due process); *Oviatt*, 954 F.2d at 1477 (holding that 114-day detention without initial appearance violated procedural due process).

Although neither the Supreme Court nor the Eleventh Circuit have defined a specific time period after which a detention becomes "prolonged," to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  In other words, a constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Here, it would have been sufficiently clear to a reasonable jailer that holding a pretrial detainee for 48 days without a court appearance would violate a constitutional right.

As noted *supra*, each aspect of an initial court appearance achieves a constitutional purpose. An initial appearance marks the formal beginning of the criminal prosecution during which a judge ensures the defendant is the person named in the complaint, informs the defendant of the charges against him, and determines conditions of release. Ala. R. Crim. P. 4.4.  In addition, the judge informs the defendant of his right to counsel and, if the defendant is indigent, of his right to appointed counsel. *Id.*  The elements of a first appearance enforce important

individual rights that are either expressly granted in the Constitution or are prescribed by Supreme Court precedent.

Recognizing the importance of these constitutional safeguards, the commentary to Rule 4.4 of the Alabama Rules of Criminal Procedure confirms that the constitutional components of a first appearance apply to Alabama's criminal process. "Rule 4.4(a) insures procedural compliance with *Miranda v. Arizona* . . . and *Escobedo v. Illinois* . . . as well as provides for the prompt determination of the conditions for release." Ala. R. Crim. P. 4.4 committee comment (internal citations omitted). A prolonged detention without a hearing, therefore, threatens and impinges upon a detainee's constitutional rights. *Alexander*, 766 F. Supp. 2d at 1229.

During her deposition, Robinson confirmed that detention facility staff, including facility directors, are trained to follow specific procedures in conformity with the Alabama Rules of Criminal Procedure, including procedures to guarantee that detainees are scheduled for timely court hearings. (Doc. 49-8 at 17.) Rule 4.3 requires that a pretrial detainee appear before a judge within three days of arrest. Ala. R. Crim. P. 4.3. If a reasonable officer knows that without a court appearance, detentions of even four days violate Rule 4.3, then it certainly would be obvious to that officer that a 48-day detention is violative. As the Alabama Court of Criminal Appeals has held, the very purpose of Rule 4.3 is "to ensure that defendants are not

forgotten and left in jail without . . . due process." *Dutell v. State*, 596 So. 2d 624, 625 (Ala. Crim. App. 1991).

Moreover, construing the facts in Murdock's favor, Murdock repeatedly protested his failure to receive a prompt court appearance, at least twice in writing. The court considers this a key factor because the Supreme Court conspicuously noted the importance of protestations in its *Baker* decision. 443 U.S. at 144-45.  As the Court suggested in *Baker,* the Constitution does not permit a jailer to hold a detainee indefinitely without procedural protections, particularly in the face of repeated protests.  Although the Constitution does not mandate the specific pretrial procedures required by the state of Alabama, it certainly does not tolerate the absence of any procedure whatsoever. *Armstrong*, 152 F.3d at 575.

Having testified about their training on the Alabama Rules of Criminal Procedure, which enforce protections afforded by the Constitution and recognized by the United States Supreme Court, Robinson and Palmer could not reasonably believe that holding Murdock in the facility for 48 days without a court appearance, in spite of his repeated protests, was constitutional.  Murdock's constitutional right to be free from prolonged detention without an appearance before a judge is obvious and therefore, clearly established.  Robinson and Palmer are not entitled to qualified immunity.  Summary judgment is due to be DENIED as to Murdock's claims against Robinson and Palmer in Count I.

### ii.    Count II

In Count II, Murdock contends that Robinson and Palmer's failure to adequately train and supervise detention facility employees on the appropriate procedures to ensure all detainees are afforded their constitutional rights led to his prolonged detention. (Doc. 32 at 11-12.)  Murdock asserts that the detention facility officers ignored his repeated verbal requests for assistance and failed to provide the appropriate documents to voice his grievances, thereby causing his unconstitutionally prolonged detention.

Robinson and Palmer dispute these allegations and argue that they trained their officers appropriately.  They assert that detention facility rovers were trained to walk through the dormitory periodically, write down any inmate requests or concerns, and respond accordingly. (Doc. 49-8 at 9-12.)  Robinson testified during her deposition that facility staff are trained to keep a supply of grievance forms on hand and to request additional forms should they run out. (*Id.* at 12.)  In addition, these defendants argue that the individual officers who ignored Murdock's requests are the ones who should be held accountable in this action.  And true enough, Murdock has not named any detention facility officers as defendants in this lawsuit. Instead, Murdock asserts that Robinson and Palmer are liable for failing to properly train facility staff to ensure they followed procedure, especially when a pretrial detainee alerts an officer that he has not received an appearance before a judge.

To the extent Murdock claims that Robinson and Palmer are responsible for the actions of the detention facility officers through a theory of *respondeat superior*, his claims are not cognizable under § 1983. *See Braddy,* 133 F.3d at 801. However, as directors of the facility, Robinson and Palmer did act in supervisory roles, so Murdock may establish liability if he demonstrates that these defendants "personally participated in the violation" or that "there was a causal connection between the actions of [the defendant(s)] and the violation." *Id.* at 801-02. This causal connection can be established where a history of widespread abuse puts a supervisor on notice of the need for more training to correct an alleged deprivation. *Id.* at 802.

As the court previously noted in its analysis of Murdock's claims against Cunningham, there is no evidence here that Robinson and Palmer were aware of regular instances of prolonged detentions or repeated incidents of officers denying access to grievance forms such that the directors should have recognized an obvious need for further training or supervision. Where the plaintiff bases a failure-to-train claim on a single incident, and where the need for training is not "so obvious," courts have held that a plaintiff failed to sufficiently allege a widespread pattern of abuse. *See, e.g., Weiland v. Palm Beach County Sheriff's Office,* 792 F.3d 1313, 1329 (11th Cir. 2015); *Diamond v. Owens*, 131 F. Supp. 3d 1346, 1381 (M.D. Ga. 2015).

Murdock has not shown that the training detention facility officers receive is constitutionally inadequate for their duties. If Murdock's version of the facts is to

be believed, these officers certainly ignored their training on multiple occasions with respect to Murdock's repeated complaints and requests for assistance, but evidence that detention facility personnel may have failed to follow procedure, even multiple times, is insufficient to satisfy a claim that Robinson and Palmer knew of the failure or were aware of any need for additional training.  *See West*, 496 F.3d at 1330 ("Evidence that the Jail staff occasionally erred and failed to fulfill duties is insufficient to satisfy the high standard for supervisory liability.").

Based on the evidentiary record, the court cannot find that Robinson and Palmer were deliberately indifferent to Murdock's constitutional rights by failing to properly train their staff.  Summary judgment on Count II is due to be GRANTED in favor of Robinson and Palmer.

### iii.   Count IV

In Count IV, Murdock charges Robinson and Palmer with failing to implement appropriate policies and adopting unconstitutional policies. (Doc. 32 at 14.)  The First Amended Complaint does little to clarify which policies these defendants failed to implement or which policies they should have adopted.  In response to summary judgment, Murdock contends that "Robinson and Palmer did not implement any policies or procedures that would ensure that the warrant was properly followed once received at the Detention Center." (Doc. 54 at 19.)  At oral argument, counsel for Murdock clarified, "the policies . . . are fine, but they were

not implemented." (Doc. 86 at 45.)   Murdock argues that Robinson and Palmer knew, or should have known, that Murdock had not had a court appearance and failed to remedy the violation. *Id.*

Robinson and Palmer respond by noting that facility policies *were* implemented here. (Doc. 50 at 37-38 (emphasis added).)   They state that each weekday morning, detention facility staff gathered the arrest warrants and detention orders and sent those documents, along with a list of newly arrested detainees, to the circuit court clerk.   The defendants note that Murdock's paperwork was stamped as received by the circuit court clerk on June 20, 2014, proving that a detention facility policy that helps to ensure detainees receive timely court appearances was properly implemented.  (Doc. 49-5 at 41-43.)

The record reveals that at some point after the circuit court clerk stamped the official notice of Murdock's arrest and detention, the process of scheduling an initial appearance broke down.   This court is unable to discern where exactly that breakdown occurred, whether in the circuit court clerk's office or the circuit judge's office, because no evidence or testimony has been presented by any party as to what the failure was or when or where it took place.   But the evidentiary record does demonstrate that, for reasons unknown at this time, Murdock was neither scheduled for a court appearance nor escorted to the courthouse the morning after his arrest.

To further support their position, Robinson and Palmer argue that the Inmate

Handbook sets forth several methods for a pretrial detainee to directly request assistance from the facility administration. Murdock counters that, although the handbook provides that grievance forms should be used to lodge complaints, the grievance forms were unavailable and his repeated requests for forms were ignored by detention facility staff, in contravention of facility policy. (Doc. 53-1 at 2; Doc. 54-3 at 88-94, 100, 104, 267-68.) Murdock does not, however, point to any other known instances of facility detainees failing to receive timely court appearances as a result of lapses in policy implementation. Therefore, to the extent Murdock asserts that Robinson and Palmer are liable for the failure of their subordinates to follow or implement policy, his claims must fail.

However, to the extent Murdock alleges Robinson and Palmer personally failed to implement facility policy, his claim survives. Murdock may establish liability as to Count IV if he can demonstrate that Robinson and Palmer "personally participated in the violation" or that "there was a causal connection between the actions of [the defendant(s)] and the violation." *Braddy,* 133 F.3d at 801.

At the summary judgment stage, this court must construe the facts in favor of Murdock as the non-movant. Murdock insists that he submitted two separate forms to Robinson and Palmer protesting his failure to be taken before a judge.[24] If a jury

---

[24] As noted *supra*, Murdock testified that his inmate request form was addressed to Robinson, whereas his grievance form complaining of his continued detention would have been routed to either Robinson or Palmer as directors of the facility.

credits this testimony, it could reasonably determine that Robinson and Palmer were on notice of Murdock's weeks-long detention without a court appearance—a violation of facility policies intended to enforce the Alabama Rules of Criminal Procedure and protect constitutional rights.  If a jury believes that Robinson and Palmer ignored these requests, as Murdock alleges, it could reasonably find that these defendants personally failed to implement facility policy and ensure Murdock's timely appearance before a judge, thereby causing his continued detention.[25]  A reasonable jury could find that the directors' inaction shocks the conscience and was therefore deliberately indifferent to Murdock's substantive due process rights; rights that this court has explained are obvious and clearly established.  Summary judgment as to Count IV is due to be DENIED.

## F.  State Law Claim against Robinson and Palmer

This leaves for resolution the state law claim in Count VII, alleging false imprisonment. (Doc. 32 at 17-18.)  Robinson and Palmer argue that, as to this claim, they are entitled to state agent immunity under Alabama state law, specifically Alabama's Jailer Act. (Doc. 50 at 39.)

---

[25] The court does note that, following Murdock's release, the detention facility implemented new policies to ensure detainees are scheduled for timely court appearances, including a partnership with the local public defender's office. (Doc. 49-7 at 5-6.)  This demonstrates that the facility has made an effort to protect against future prolonged detentions, but with regard to Murdock's requests for assistance during his own detention, a reasonable jury could find that those requests provided notice to the directors of an ongoing constitutional violation, yet fell on deaf ears.

Alabama's false imprisonment statute, § 6-5-170, provides: "False imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala. Code § 6-5-170.

In Alabama, state law claims for monetary damages against a sheriff are barred by Art. I, § 14. *Ex parte Purvis*, 689 So. 2d 74 (Ala. 1996); *McMillan v. Johnson*, 101 F.3d 1363, 1364-65 (11th Cir 1996). Deputy sheriffs are entitled to the same immunity afforded sheriffs. *Hereford v. Jefferson County*, 586 So. 2d 209, 210 (Ala. 1991).

Following the passage of the Jailer Act in 2011, district courts in Alabama have interpreted the Act to entitle jailers to the same immunity enjoyed by sheriffs and deputies, provided the jailers are acting within the line and scope of their duties and in compliance with the law. *Young v. Myhrer*, 243 F. Supp. 3d 1243, 1257-58 (N.D. Ala. 2017).

In *Young v. Myhrer*, a district judge found that the phrase "in compliance with the law," as used in the Act, provides jailers with immunity from suit for all state law torts, as long as that the jailers were complying with criminal and civil statutes as well as constitutional standards. *Id.* According to *Young*, "if a case has reached the dispositive motions phase, only when sufficient evidence exists that a jailer has violated a criminal statute, a civil statute, or a constitutional principle does he lose the Jailer Act's sovereign immunity protection and become subject to Alabama tort

laws." *Id.* at 1258; *see also Johnson v. Milliner*, 65 F.Supp.3d 1295, 1305 (S.D. Ala. 2014) (denying immunity under the Jailer Act when a dispute of material fact existed as to whether the defendant had violated the plaintiff's constitutional rights).

Here, in its analysis of Robinson and Palmer's qualified immunity defense, the court already has found that, at all times relevant to the First Amended Complaint, Robinson and Palmer were acting within the scope of their duties as directors of the detention facility. The court has also identified a material dispute of fact regarding Robinson and Palmer's deliberate indifference to Murdock's constitutional rights. As a result, consistent with the findings of other district courts, these defendants have not shown that they were acting in compliance with constitutional standards and are consequently not entitled to immunity under the Jailer Act. If a jury finds that Robinson and Palmer violated Murdock's constitutional rights by ignoring his written complaints, that jury could reasonably find that these defendants unlawfully detained Murdock, depriving him of personal liberty, and thereby find in Murdock's favor as to his false imprisonment claim. Ala. Code § 6–5–170. Summary judgment is due to be DENIED as to Count VII.

## VI.   CONCLUSION

For the foregoing reasons, it is ORDERED as follows:

1. The Motion for Summary Judgment (Doc. 46) filed by Defendants City of Montgomery, Kevin Murphy, Jeremy Lewis, and Nickie Givan is GRANTED as to the federal claims (Counts I, II, and III);

2. The Plaintiff's state law claims against Defendants City of Montgomery, Kevin Murphy, and Jeremy Lewis and Nickie Givan (Counts VII, VIII, IX, X and XII) are DISMISSED without prejudice;

3. The Motion for Summary Judgment (Doc. 48) filed by Defendants Montgomery County, Derrick Cunningham, Wanda Robinson, and Barbara Palmer is GRANTED as to the federal claims against Derrick Cunningham (Counts I, II, and III);

4. The Motion for Summary Judgment (Doc. 48) is GRANTED and as to Count II against Wanda Robinson and Barbara Palmer;

5. The Plaintiff's claims against Montgomery County (Counts I, II, III, V, and VI) are DISMISSED with prejudice;

6. The Plaintiff's state law claims against Derrick Cunningham (Counts VII and X) are DISMISSED without prejudice;

7. All claims for equitable relief are DISMISSED as moot;

8. The City of Montgomery, Kevin Murphy, Jeremey Lewis, Nickie Givan, Montgomery County, and Derrick Cunningham are DISMISSED as defendants; and

9. The Motion for Summary Judgment (Doc. 48) filed by Defendants Wanda Robinson and Barbara Palmer is DENIED as to Counts I, IV, and VII. These claims shall proceed.

DONE this the 17th day of September, 2021.


_____ /s/ R. Austin Huffaker, Jr. _____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE